IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 1, 2022

## IN RE NAVAIYA R., ET AL.

**Appeal from the Juvenile Court for Montgomery County**
**No. 20-JV-597, 20-JV-652    Tim Barnes, Judge**

_____

### No. M2021-01387-COA-R3-PT

_____

This appeal involves a petition to terminate parental rights.  The juvenile court found by clear and convincing evidence that two grounds for termination existed as to the father: (1) failure to manifest an ability and willingness to assume custody and (2) incarceration under a ten-year sentence.  The juvenile court also found that termination was in the best interests of the children.  The father appeals.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which W. NEAL MCBRAYER and KRISTI M. DAVIS, JJ., joined.

John D. Parker, Clarksville, Tennessee, for the appellant, Willie D. C.

Herbert H. Slatery III, Attorney General and Reporter, and Courtney J. Mohan, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I.    FACTS & PROCEDURAL HISTORY

Margaret A. R. ("Mother") and Willie D. C. ("Father") are the unmarried parents of Navaiya and Olivia.[1]  Although the juvenile court ultimately terminated the parental rights of both Mother and Father in this case, this appeal only involves the termination of Father's parental rights.[2]  Therefore, we focus primarily on the facts involving Father and the children.

_____

[1] Navaiya was born in 2011, and Olivia was born in 2012.
[2] Mother's parental rights were terminated by the juvenile court.  However, she did not appeal.

In March 2019, while the children were living with Mother, the Tennessee Department of Children's Services ("DCS") became involved when Mother gave birth to her third child.[3]  During prenatal screenings, Mother tested positive for THC and oxycodone.  When the child was born, the child tested positive for oxycodone and was diagnosed with Neonatal Abstinence Syndrome.  As a result, DCS received a referral with allegations of a drug-exposed child.  Mother submitted to a drug screen and tested positive for several illegal substances.  Due to concerns for the children's safety, they were removed from Mother's custody, and temporary legal custody of the children was awarded to DCS.  As we will explain *infra*, Father was incarcerated at that time.  The children were initially placed in a foster home in Tennessee.  They were later placed with a maternal aunt in Texas, but they were returned and placed in a foster home in Tennessee at least a year before the final hearing.

In May 2020, DCS ultimately filed a petition to terminate the parental rights of both Mother and Father.  DCS alleged three grounds against Father: (1) failure to manifest an ability and willingness to assume custody; (2) incarceration under a ten-year sentence; and (3) failure to establish/exercise paternity.[4]  DCS also alleged that termination was in the best interests of the children.  Father filed an answer to the petition in July 2020.  The juvenile court held a hearing on the petition in November 2021.  At the hearing, only two witnesses testified: Father and a DCS worker.

Ms. Sara Brogdon testified as the DCS team leader and a former case manager who was involved with the family.  She stated that the children were moved into foster care in March 2019 and had been in foster care since then.  At the time of the hearing, the children had been in their current foster home for over a year.  She explained that the children were doing very well and their current foster home had provided for all of their needs.  Furthermore, the foster parents were willing to adopt the children.  In regard to Father, she testified that she was unsure if he was listed on the birth certificate for the children, but he had since legitimated the children and was their legal father.  Based on his incarceration, she did not feel that he had manifested an ability and willingness to personally assume legal and physical custody or financial responsibility of the children.  Additionally, she thought that placing the children in Father's legal and physical custody would pose a risk of substantial harm to the children.  She explained that the children did not have a relationship with Father and had not had a relationship with him since they had been in DCS custody.  She stated that Father had not reached out to see how the children were doing or where they were living.  As such, she concluded that it was in the children's best interests to terminate the parental rights of Father.

---

[3] DCS had previously removed the children from Mother in 2016.  Additionally, Mother's third child was a "half-sibling" of Navaiya and Olivia, so Father was not the father of this child.

[4] At the termination hearing, DCS chose not to proceed with the third ground as to Father—failure to establish/exercise paternity.

Father primarily testified about his criminal history and incarceration. Although the extent of his prior criminal record was unclear, he claimed to have had a couple of "run-ins" with the law in the past, such as public intoxication and driving without a license. He stated that he had previously been in prison in 2010 and 2012. He was charged with aggravated robbery in 2014, which was later amended to a robbery charge. He was also charged with domestic assault and vandalism in 2016, but he stated that he was never convicted. At the time of the hearing, he testified that he had been incarcerated since mid-2016, when he was arrested on federal charges for possessing a firearm after a felony conviction. In June 2019, he received a 180-month sentence for that offense. At that time, both of his children were under eight years of age. At the time of the termination hearing, he explained that he had been incarcerated for approximately 65 months of his 180-month sentence. However, he further explained that his case was back in court, and he was hopeful he would be re-sentenced to lesser time because he claimed that he was wrongly sentenced. Additionally, Father testified that he received custody of the children for a period of time in 2015 while Mother was incarcerated.[5] He stated that the children did not "want for anything" while they were in his care. After Mother was released from jail, Father eventually returned the children to Mother's custody.

Father stated that he was unable to call his children after their removal from Mother's custody because he was unaware of where they were living. However, he did have the opportunity to speak with the children when they were living with the maternal aunt in Texas in 2019. He stated that he wanted to be able to speak to his children, that he would send them gifts if he could, and that he loved them. He admitted that he had "not sid[ed] with the law enforcement" in the past, but he still took care of and supported his family. He was of the opinion that his "run-ins" with the law did not affect his children at all. He did not feel that it was in the children's best interests to have his parental rights terminated.

Following this hearing, the juvenile court entered an order terminating the parental rights of Father and a final decree of full guardianship. The juvenile court found by clear and convincing evidence that two grounds for termination existed as to the father: (1) failure to manifest an ability and willingness to assume custody; and (2) incarceration under a ten-year sentence. The juvenile court also found that termination was in the best interests of the children. Thereafter, Father timely filed an appeal.

## II.    ISSUES PRESENTED

Father presents the following issue for review on appeal, which we have slightly restated:

---

[5] The dates that the children were in Father's custody are not clear in the record.

1. Whether the juvenile court erred in finding that the State met its burden of clear and convincing evidence in order to terminate Father's parental rights.

For the following reasons, we affirm the decision of the juvenile court.

## III. STANDARD APPLICABLE TO TERMINATION CASES

"A parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (quoting *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016)). "Parental rights have been described as 'far more precious than any property right.'" *Id.* (quoting *In re Carrington H.*, 483 S.W.3d at 522). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015). Nevertheless, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522.

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to this statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the best interests of the children under the factors set forth in Tennessee Code Annotated section 36-1-113(i). *Id.* Due to the constitutional dimension of the rights at stake, the petitioner seeking termination must prove both elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see* Tenn. Code Ann. § 36-1-113(c). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings." *Id.* (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

Because of the heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d at 861. We review a court's factual findings de novo in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure, presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. We then make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). As for conclusions of law, "[t]he trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which

appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

IV.   DISCUSSION

*A. Grounds for Termination*

**1. Failure to Manifest an Ability & Willingness to Assume Custody**

The first ground for termination at issue on appeal exists when "[a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]" Tenn. Code Ann. § 36-1-113(g)(14). There are two prongs that must be proven by clear and convincing evidence to terminate parental rights under this ground: "(1) the parent . . . failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d at 674.

Our Supreme Court has explained that the first prong "places a conjunctive obligation on a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. As such, "clear and convincing proof that a parent . . . has failed to manifest <u>either</u> ability or willingness" satisfies the first prong of this ground. *Id.* (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). "A parent demonstrates willingness 'by attempting to overcome the obstacles that prevent [him] from assuming custody or financial responsibility for the child.'" *In re Sylvia H.*, No. E2020-01009-COA-R3-PT, 2021 WL 1098630, at *6 (Tenn. Ct. App. Mar. 23, 2021) (quoting *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018)). "In determining whether a parent has manifested an ability to parent the child, a court 'focuses on the parent's lifestyle and circumstances.'" *Id.* (quoting *In re Jonathan M.*, 2018 WL 5310750, at *5).

As for the second prong, a court "examines the effect that placing the child in the parent's custody would have on the child—namely, whether the parent's assumption of custody would present 'a risk of substantial harm to the physical or psychological welfare of the child.'" *Id.* at *7 (quoting Tenn. Code Ann. § 36-1-113(g)(14)). To rise to the level of "substantial," we have held that the harm must present "'a real hazard or danger.'" *Id.* (quoting *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001))). Additionally, the harm must be "'sufficiently probable to prompt a reasonable person to

- 5 -

believe that the harm will occur more likely than not.'" *Id.* (quoting *In re Maya R.*, 2018 WL 1629930, at *8 (quoting *Ray*, 83 S.W.3d at 732)).

In its order, the juvenile court found that (1) Father failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the children; and (2) placing the children in the legal and physical custody of Father would pose a risk of substantial harm to the physical or psychological welfare of the children. In regard to Father, the court made the following relevant findings:

> As to Father, the Court finds that he is currently incarcerated for a conviction of being a felon in possession of a firearm. He had previously been adjudicated a felon and had a history of conduct that led to several incarcerations and his present confinement. He has led a lifestyle that demonstrates crime is a concern in his life.
>
> . . .
>
> As to Father, he has had little to no contact with the children. He knew the children were in DCS custody. Father testified that he was misled by Mother. Even if Mother did not mislead Father, he has not taken steps to maintain contact with DCS or the children. Father could have and should have reached out if he wanted to be a part of the children's lives.
>
> Father is not presently in a position to take custody of the children. Prior to his incarceration, his criminal conduct was such that he would be a physical risk to the children's safety. Further, the children are settled and doing well in their current foster home.
>
> . . .
>
> The Court finds that the children are thriving in their current placement. It would be psychologically harmful to the children to move them from this home.

Based on these findings, the court found that DCS had proven this ground for termination by clear and convincing evidence.

First, we address Father's ability to assume physical and legal custody or financial responsibility of the children. Father stated that he had a couple of "run-ins" with the law in the past, and he was incarcerated in 2016. His choice of lifestyle led him down a path where he must now serve a 180-month sentence for possession of a firearm after a felony conviction. Moreover, he demonstrated an inability to understand how his behavior and its consequences affected his children. As a result of his incarceration, Father will now be

absent from his children's lives and unable to participate in the remainder of their childhood. He "does not currently have the *ability* to assume physical and legal custody or financial responsibility of the children." *In re LaiLonnii J.*, No. E2018-01198-COA-R3-PT, 2019 WL 669758, at *8 (Tenn. Ct. App. Feb. 19, 2019). Therefore, the first prong of this ground is satisfied.

Second, despite Father's inability to assume custody of the children due to his incarceration, we address whether placing the children in Father's custody would pose a risk of substantial harm to the physical or psychological welfare of the children. At the time of the hearing, Father had been incarcerated for more than five years and the children had been in foster care for more than two-and-one-half years. The children had been in their current foster home for more than a year. The children were doing very well and their current foster home has provided for all of their needs. Furthermore, their foster parents were willing to adopt the children. Ms. Brogdon explained that the children did not have a relationship with Father and had not had a relationship with him since they entered DCS custody in March 2019. According to Father, he last spoke with the children when they were living with the maternal aunt in Texas in 2019. The children are now in a stable environment with their foster parents who care and provide for them, and we find that removing them from this situation to be with Father, even if it were a possibility, would pose a risk of substantial harm to their psychological welfare. We find that the second prong of this ground is satisfied.

As such, we conclude that the juvenile court did not err in finding that DCS proved by clear and convincing evidence the ground of failure to manifest an ability and willingness to assume custody of the children.

## 2. Incarceration Under a Ten-Year Sentence

The second ground for termination at issue on appeal exists when "[t]he parent has been confined in a correctional or detention facility of any type, by order of the court as a result of a criminal act, under a sentence of ten (10) or more years, and the child is under eight (8) years of age at the time the sentence is entered by the court[.]" Tenn. Code Ann. § 36-1-113(g)(6). This ground "is based on the parent's status—i.e., having received a prison sentence of ten or more years." *In re Adrianna S.*, 520 S.W.3d 548, 560 (Tenn. Ct. App. 2016); *see* Tenn. Code Ann. § 36-1-113(g)(6). "If a parent is confined in any type of facility under a criminal sentence of ten or more years and the child is under the age of eight when the sentence is entered, the conditions of the statute are met and grounds exist to terminate that parent's rights." *In re LaiLonnii J.*, 2019 WL 669758, at *4 (citing *In re D.M.*, No. M2009-00340-COA-R3-PT, 2009 WL 2461199, at *3 (Tenn. Ct. App. Aug. 12, 2009)). In regard to this ground, the juvenile court made the following findings:

> Father is in prison, because he received a sentence of ten or more years for Felon in Possession of a Firearm by the Federal District Court for the Middle

District of Tennessee on June 3, 2019. Father was sentenced to one hundred and eighty months in prison. A certified copy of this Order was entered as an exhibit in this cause.

The children were younger than eight years old when the sentence was imposed. Specifically, the Court finds that the child, Navaiya . . . , was seven years of age when Father's sentence was imposed. The child, Olivia . . . , was six years of age when Father's sentence was imposed.

Based on these findings, the court found that DCS had proven, by clear and convincing evidence, this ground for termination.

We have reviewed the Federal District Court's judgment from June 2019, which sentenced Father to serve 180 months of imprisonment. There is no question that Father received a sentence of ten or more years by court order as a result of a criminal act. *See* Tenn. Code Ann. § 36-1-113(g)(6). Furthermore, both Navaiya and Olivia were under the age of eight years old at the time the sentence was entered by the Federal District Court in June 2019. Navaiya was seven years old at the time, and Olivia was six years old at the time. Father testified that he was seeking post-conviction relief at the time of the hearing and requested that this should be considered because he was likely to be re-sentenced to lesser time. However, we have held that this argument is meritless. *In re Audrey S.*, 182 S.W.3d at 876. "[A] court considering a petition for termination of parental rights based on Tenn. Code Ann. § 36-1-113(g)(6) need not look beyond the judgment of conviction and the sentence imposed by the criminal court in order to determine whether this ground for termination applies."[6] *Id.* (citations omitted). Therefore, we conclude that the juvenile court did not err in finding that DCS proved by clear and convincing evidence this ground for termination.

### B. Best Interests of the Children

We now review whether termination was in the best interests of the children. At the outset, we note that the juvenile court considered the new factors in Tennessee Code Annotated section 36-1-113 rather than the factors that were in effect at the time the petition was filed in May 2020.[7] However, we have explained that the use of the incorrect factors

---

[6] This Court further explained that "[i]f the mere possibility that a conviction might be reversed, or a sentence reduced, at some point in the future were sufficient to defeat the application of this ground for termination of parental rights, then Tenn. Code Ann. § 36-1-113(g)(6) would be a dead letter." *In re Audrey S.*, 182 S.W.3d at 876.

[7] The Legislature recently amended the statute on April 22, 2021, which now includes 20 factors for consideration. *See* 2021 Tenn. Laws Pub. Ch. 190 (S.B. 205), eff. Apr. 22, 2021. However, "[t]his amendment does not affect the instant case because [courts] apply the version of the statute in effect at the time the petition for termination was filed." *In re Porcalyn N.*, No. E2020-01501-COA-R3-PT, 2021 WL 2026700, at *12 n.6 (Tenn. Ct. App. May 21, 2021); *see In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct.

does not constitute reversible error. *See In re Bralynn A.*, No. M2021-01188-COA-R3-PT, 2022 WL 2826850, at *9 (Tenn. Ct. App. July 20, 2022); *In re Da'Moni J.*, No. E2021-00477-COA-R3-PT, 2022 WL 214712, at *23 (Tenn. Ct. App. Jan. 25, 2022). Here, like the *In re Bralynn A.* case, Father does not raise an argument that the juvenile court considered the incorrect factors. Rather, his brief cites only to the nine best interest factors that were in effect at the time the petition was filed. Therefore, we consider those statutory factors that were in effect at the time the petition was filed.

In considering these factors, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878. We view the children's best interests from the children's perspective rather than the parent's perspective. *Id.* Finally, we "must consider all of the statutory factors, as well as any other relevant proof any party offers." *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017). However, "a finding on each factor is not required." *In re Kaylene J.,* No. E2019-02122-COA-R3-PT, 2021 WL 2135954, at *18 (Tenn. Ct. App. May 26, 2021). The nine statutory factors are listed as follows:

> (1) Whether the parent . . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent . . . ;
>
> (2) Whether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent . . . has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent . . . and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent . . . , or other person residing with the parent . . . , has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's . . . home is healthy and

App. 2017).

safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent . . . consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent . . . has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

Father has demonstrated a history of criminal activity, which ultimately led to his incarceration for 180 months. As such, due to his conduct and his current circumstance, he is unable to provide a home or care for his children. We find that factor one weighs in favor of termination. *See* Tenn. Code Ann. § 36-1-113(i)(1). Father testified that the only thing DCS ever sent him was a paper informing him that his rights were being terminated. According to Ms. Brogdon, Father had not contacted her about the petition or the children. She stated that DCS sent him the permanency plans and the criteria for termination of parental rights. During the entire time that the children have been in DCS custody, Father has been incarcerated in Kentucky. Outside of sending mail, DCS never offered any services to Father because of his incarceration. Under the circumstances, a lasting adjustment does not reasonably appear possible, at least during the time of the children's minority. Therefore, we find that factor two weighs in favor of termination. *See* Tenn. Code Ann. § 36-1-113(i)(2).

The juvenile court stated that "Father has not maintained contact with DCS and has shown no interest in the children." Ms. Brogdon explained that DCS was unable to take the children to Kentucky for visitation, which was where Father was incarcerated. She also explained that DCS did not pay for collect calls so she was unable to arrange calls between Father and the children. She stated that she never personally spoke with Father. Father testified that he never had any kind of communication with DCS to let him know where his kids were living. He explained that he was unable to contact his children because of this. However, he testified that he spoke with his children when they were living in Texas with the maternal aunt in 2019. Other than these phone calls he claimed to have made in 2019, Father had not exercised any visitation with his children. We find that factor three weighs in favor of termination. *See* Tenn. Code Ann. § 36-1-113(i)(3).

Additionally, Father did not have a meaningful relationship with the children. The juvenile court stated that Father's incarceration "impacted his ability to have a relationship with the children," and it was "not likely that [he] would be able to develop a

healthy attachment with the children." Father had been incarcerated since 2016 and had last spoken with the children sometime in 2019, which was roughly two years before the hearing in November 2021. We find that factor four weighs in favor of termination. *See* Tenn. Code Ann. § 36-1-113(i)(4). At the time of the hearing, the children had been in foster care for more than two-and-one-half years. The children had been in their current foster home for more than a year, were doing very well, and their current foster home had provided for all of their needs. In addition, their foster parents were willing to adopt them. Removing the children from this situation would likely have an effect on the children's emotional and psychological condition. Factor five weighs in favor of termination. *See* Tenn. Code Ann. § 36-1-113(i)(5).

Moreover, as previously stated, Father did not have a home that was healthy and safe because he was incarcerated, but even if he did, he had consistently engaged in criminal behavior in the past which raised concerns about his ability to care for the children in a safe and stable manner. His inability to understand how his behavior and its consequences affected his children was concerning as well. We find that factor seven weighs in favor of termination. *See* Tenn. Code Ann. § 36-1-113(i)(7). Finally, there was testimony that Father failed to provide anything beyond token support for the children. Therefore, we find that factor nine weighs in favor of termination. *See* Tenn. Code Ann. § 36-1-113(i)(9).

A number of these factors weigh against Father due to his incarceration. *See In re Brian M.*, No. E2014-00941-COA-R3-PT, 2015 WL 78179, at *8 (Tenn. Ct. App. Jan. 6, 2015) ("A number of the best interest factors weigh against Father due to his incarceration . . . ."). While Father may love his children, his choice to engage in repeated criminal behavior and his resulting incarcerations have rendered him unable to provide a home for them, maintain a relationship with them, care for them, and provide for their needs. After reviewing the best interests factors, we conclude that the juvenile court properly determined that termination of Father's parental rights was in the children's best interests.

## V.    CONCLUSION

For the aforementioned reasons, we affirm the decision of the trial court. Costs of this appeal are taxed to the appellant, Willie D. C., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE